# EXHIBIT E

| | |
|---|---|
| Yelp, Inc.<br>350 Mission St., 10th Floor<br>San Francisco, CA 94105<br>　　　　　Complainant<br><br>v.<br>Paul Moreno<br>16 Walker St.<br>Watsonville, CA 95076<br>　　　　　Respondent | Domain Name in Dispute:<br><br><br><br>*yelp.ai* |

# RESPONSE TO COMPLAINT IN ACCORDANCE WITH
# THE UNIFORM DOMAIN NAME DISPUTE RESOLUTION POLICY

**(i). Response to Statements and Allegations in Complaint**

**(1)  The Domain Name is Not Confusingly Similar to the Registered Marks**

"Yelp," as applied to Complainant's services is an arbitrary word mark and has a common meaning and definition as "to make a sudden, short, high sound, usually when in pain" **(Annex A)**, "to give a quick, sharp, shrill cry, as a dog or fox" **(Annex B)**, or "to utter a sharp quick shrill cry" **(Annex C)**.

Respondent does not dispute the validity of Complainant's trademark registrations, but notes that they are limited to their respective goods and services, which can be summarized as the operation of a website for the review of other businesses and related services. Complainant does not own the rights to any mark named "Yelp AI" or similar, nor does Complainant claim any AI-related services in any of its registered trademarks.

The Lanham Act provides rights to trademarks based on the "use in commerce" of those

trademarks. It is well established that protection of those marks is only to the extent that the source of the goods or services would be confused (*In re Majestic Distilling Co.*, 315 F.3d 1311, 1316, 65 USPQ2d 1201, 1205 (Fed. Cir. 2003)), and further, the exact same mark can be used by another party on different goods or services without the violation of any trademark rights (*American Steel Foundries v. Robertson*, 269 U.S. 372). For example, "Delta" is both used as an airline company, and separately without confusion, a faucet-making company **(See Annexs D and E)**. The difference in their domain names is the word "faucets." **(See Annexs D and E)** to distinguish the airline from the faucet company, although the mark owned by the airline company is entirely incorporated into the <deltafaucets.com> domain.

Further, the examples provided by Complainant are distinguishable from his situation; most include marks that are fanciful, not arbitrary, meaning that those marks do not have other uses or known meanings, or are surnames with secondary meaning. Specifically, "Commscope," and "Fiverr" are made-up words, and it can be assumed that any individual using them are only using them because of their distinctiveness, whereas "Dolby," "Dell," and "LockheedMartin," are all surnames of the founders that have lost association as a name because of their association with the business, and are fanciful in the mind of the consumer (Respondent does recognize that "dell" has a dictionary meaning, however, its use is archaic and uncommon in American English; most ordinary consumers would not know the definition of the word "dell"). Complainant does not have the same protection; the word "yelp" continues to be a common word in the English language associated with its dictionary definition.

There are many uses of the word "Yelp" that would be non-infringing, including those where the "ai" part would be appropriate, such as a company operating in artificial intelligence, which Yelp does not claim as part of its services. Accordingly, as Respondent's website is not yet

Response to Complaint
PAGE 2

live and no use of the disputed domain exists, the disputed domain cannot be confusingly similar to Complainant's marks. Complainant has instituted this dispute preemptively, and without appropriate grounds for confusion.

### (2) Respondent Has Legitimate Interests in the Domain Name

Complainant claims that Respondent does not have legitimate rights or interest in the disputed domain name, but misstates the facts. Specifically, (1) Respondent does not require Complainant's authorization to have rights or interests in the domain or trademark, (2) Respondent's use has not yet begun, so of course it would not yet be commonly known by the name, and (3) Respondent has not yet begun use, because Complainant instituted a dispute before the website could be built. A website is often the first sign of a business' operation, and domain names are very frequently purchased to reserve a name; it would be impractical to settle on a business name only to find that there is no appropriate domain name available.

First, as established above, Complainant is not the exclusive holder of all rights in "yelp," only the exclusive holder of all rights in the registered trademarks, which are limited to the goods and services in which they are used (15 U.S.C. § 1051(a)(3)(C) and 15 U.S.C. § 1071), and the relatedness of the goods or services is a determining factor in any assessment of infringement or likelihood thereof (*In re E. I. du Pont de Nemours and Company*, 476 F.2d 1357, 177 USPQ 563 (C.C.P.A. 1973), *See, e.g., Stratus Networks, Inc*., 955 F.3d at 999, 2020 USPQ2d 10341, at *5 (quoting *Han Beauty, Inc. v. Alberto-Culver Co*., 236 F.3d 1333, 1336, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001)).

However, upon receiving notice that there may be potential infringement, Respondent

Response to Complaint
PAGE 3

offered first to redirect the disputed domain to Complainant's website, at no cost to Complainant, and also to quickly settle and transfer the domain name for the amount in which Respondent paid for it because the website was not yet fully built or live, and therefore easily changed (**See Complainant's Annex 7**). Complainant states that Respondent "demanded" $5000, but did not provide receipts or evidence of any sort, however, Complainant was, at that time, an attorney discussing legal settlement with a layperson and no such request was made to Respondent's counsel upon notification that Respondent has obtained such counsel (**See Annex F**).

As the more sophisticated party, it is the burden of Complainant to make such ordinary requests.[1] It is a completely reasonable response from a layperson dealing with the attorney of a large company to request reimbursement for actual out-of-pocket costs, the Complainant failed to request any of the supposedly important information, such as to whom Respondent paid the $5000, for what purpose Respondent registered the domain, and why the estimated legal fees were so high, and if they could be lowered. If Complainant wanted such information, Complainant should have asked for it, but Complainant did not attempt to communicate in any such substantial manner and is now, for lack of a better term, complaining about it.

In addition, Complainant continues to misrepresent its position as the owner of "all" trademark rights in "yelp," the word, which is patently false. As stated in the response to the confusion issue, above, there are many potential uses of "yelp" that do not violate or infringe upon Complainant's trademarks, so by merely registering the name and without evidence of the actual

---

[1] In the July 7, 2023 email, this lawyer requested *estimated* legal fees, not actual. It is in the ordinary course of dealing to provide such an estimate when making such a settlement offer, with the actual amount to be determined at the time of settlement, but not to exceed the provided estimate. Accordingly, the $5000 in legal fees was not for the preceding 10 days, but the retainer amount, which would have been explained had Complainant asked for such an explanation. Further, it should be noted that Complainant did not attempt to negotiate the amount in any way, whatsoever, which is also an expected and ordinary part of the settlement process. Further, for clarity, the July 7, 2023 email was followed up with the complaint, not any sort of negotiation or discussion. **See Annex F.**

Response to Complaint
PAGE 4

use, Complainant cannot claim that there is no authorized use because Respondent's use of "yelp" does not require Complainant's authorization.

Second and third, it is a common practice to settle on a business or product name after reserving the domain name, as is the case here. The registrant is almost never the name of the business or product because that name is often undecided until after the domain is reserved to avoid the possibility of settling on a name only to find that there is no appropriate domain name available. Further, websites that require building are not often immediately available because it takes time and money to build the website, and money may come and go for ordinary individuals leading to long periods of no work being done, or having to do the work on their own. These facts, on their own, are not sufficient to determine that there is no legitimate use of the domain name; it is only evidence that the domain name is not yet being used in its final, public-facing intended manner.

Complainant might have known Respondent's intended legitimate use of the domain name, if it had requested such information, but it did not. Complainant assumes that because the website is not yet live that Respondent is not making use of it, but Complainant has no grounds for that assumption other than the public unavailability of the website and Complainant's own desire to obtain the domain name at minimal cost to itself.

### (3) Respondent is Not Operating in Bad Faith

Complainant alleges that Respondent has registered and used the disputed domain in bad faith, primarily alleging that Respondent has attempted to sell the domain in excess of what was paid for it. However, again, Complainant is making assumptions based on its desire to obtain the

Response to Complaint
PAGE 5

domain name at a minimal cost to itself.

Specifically, Complainant never received the actual receipts for the registration of the disputed domain name and is going by the generic quoted ".ai" top level domain price on the <namecheap.com> informational page, completely ignoring the existence of NameCheap's "premium domains," which are priced differently from ordinary domains **(See Annex G)**. For example, a search or <yelp.ai> marks it as unavailable, but other top-level domains, including, <yelp.game>, <yelp.store>, and <yelp.tv> are all significantly more expensive than the $79.98 quoted price **(See Annex H)**, with <yelp.tv> listed at $35,000 and <yelp.store> at $5,000. Therefore, without actual receipts of what Respondent paid, Complainant is severely misinformed about the actual price and making very erroneous assumptions to further its own interests.

As previously discussed, the inclusion of attorneys fees are not in excess, they were an estimate based on the retainer amount this attorney has developed based on experience in similar issues. Complainant did not request any additional information about the inclusion of attorney's fees **(see Footnote 1, above, and Annex F)**. Such attorney's fees were not a doubling of the request to pay the registration costs and were an entirely separate issue and request that Complainant did not, in any way, attempt to negotiate, though it very much had the power to do so.

Additionally, actual knowledge of a trademark does not preclude the ability to use the same word in a non-infringing manner, and the existence of a trademark registration in certain goods or services does not grant the registrant rights to preclude all other use of that same mark on different goods or services (see above, in the response to the first issue). Respondent does not dispute its advance knowledge of Complainant's marks, however, it does dispute Complainant's assertion that actual knowledge of a trademark is enough to determine bad faith, which is factually incorrect;

Response to Complaint
PAGE 6

there are many situations where the registrant of a domain name can have actual knowledge of a trademark and it be completely irrelevant to the determination of good or bad faith use, as is the case here, where Respondent's use is unknown to Complainant and is certainly not infringing nor intended to infringe.

Certainly, if Respondent had intended to extort Complainant or only registered the domain name to receive payment, Respondent would have attempted to sell the domain name for more than what was paid for it and associated costs, and additionally, would have contacted Complainant directly to effectuate such a sale sometime in the two-year period preceding Complainant's letter. Further, it is unlikely that Respondent would have offered to redirect the domain name to Complainant's website for no cost if Respondent had been acting in bad faith, an offer that Complainant rejected and a fact that Complainant conveniently ignores and omits **(See Complainant's Annex 7, and again in Annex F)**.

Complainant bases its allegations of bad faith on a single individual's limited ability to finish a large project while operating another business full time and a request for out-of-pocket costs associated with starting and protecting such project. Not only has Complainant egregiously misrepresented trademark law and the facts, but it is attempting to forcibly transfer a domain name that Respondent has spent a great amount of personal money to obtain and defend and calling it "bad faith," as the pot calls the kettle black.

### (4) Conclusion

As discussed in Issues 1, 2, and 3, Complainant mistakes its own ignorance, lack of information, and failure to communicate for ill intent on Respondent's behalf, which is not at all

Response to Complaint
PAGE 7

the case. Complainant's trademark rights do not prohibit the use of the word "yelp" in non-infringing manners, neither should those uses be precluded from registering an appropriate domain name. While Respondent's use of the domain name has not yet been fully developed, incompletion does not equate or amount to an illegitimate use, bad faith, or infringement of Complainant's trademarks. Respondent is accordingly well within his rights to register, use, and maintain <yelp.ai>, as he has done without issue for two years, and if he desires, to sell the domain name to Complainant for the costs of such registration, maintenance, and defense. Therefore, Respondent respectfully requests that the Panel dismiss the compliant and affirm Respondent's ownership of <yelp.ai>.

**(ii). Contact Information**

For Respondent:

|  |  |
|---:|:---|
| Name: | Paul Moreno |
| Postal Address: | 16 Walker St. |
|  | Watsonville, CA 95076 |
| Email Address: | <bydomain@proton.me> |
| Telephone Number: | (831) 818-9453 |

For Respondent's Legal Counsel and Authorized Representative:

|  |  |
|---:|:---|
| Name: | Meghan Pratschler |
| Law Firm: | Meghan the Attorney, LLP |
| Postal Address: | 95 Third Street |
|  | 2nd Floor |
|  | San Francisco, CA 94103 |
| Email Address: | <meghan@meghantheattorney.com> |
| Telephone Number: | (415) 335-9226 |

**(iii). Preferred Method of Communication**

Respondent prefers communication through its Legal Counsel and Authorized Representative, Meghan Pratschler of Meghan the Attorney, LLP, above, via electronic means at the respective email address listed above. For physical copies of materials, a copy mailed to both Respondent and Meghan Pratschler, and copied electronically to Meghan Pratschler, but only when physical copies are required and not optional.

**(iv). Selection of Single or Three-Member Panel**

Respondent accepts a single member panel.

**(v). Selection Three-Member Panel Candidates**

Respondent accepts a single member panel.

**(vi). Identification of Other Legal Proceedings**

Respondent is not aware of any other legal proceedings in connection with or relating to the disputed domain name.

**(vii). Certification**

Respondent certifies that a true and accurate copy of this Response to Complaint and it's Annexes has been transmitted to Complainant on this August 14, 2023 through its Authorized

Representative, Reed Lyon, via email to reedlyon@yelp.com.

**(viii). Statement**

Respondent, through its Authorized Representative certifies that the information contained in this Response is to the best of Respondent's knowledge complete and accurate, that this Response is not being presented for any improper purpose, such as to harass, and that the assertions in this Response are warranted under these Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument

Dated this August 14, 2023.

Respectfully Submitted,

Meghan E. Pratschler

By: */s/ Meghan E. Pratschler*
Meghan E. Pratschler
Member of the California Bar
No. 324970
95 Third Street
Second Floor
San Francisco, CA 94103
415-335-9226
meghan@meghantheattorney.com
Legal Counsel and Authorized
Representative for Respondent