# EXHIBIT F



# DECISION

Yelp Inc. v. Paul Moreno / Moreno Roofing and Solar

Claim Number: FA2307002054114

## PARTIES

Complainant is **Yelp Inc.** ("Complainant"), represented by **Reed Lyon**, California, USA.  Respondent is **Paul Moreno / Moreno Roofing and Solar** ("Respondent"), represented by **Meghan Pratschler** of **Meghan the Attorney, LLP**, California, USA.

## REGISTRAR AND DISPUTED DOMAIN NAME

The domain name at issue is <**yelp.ai**> (the "Disputed Domain Name"), registered with **NameCheap, Inc.**

## PANEL

The undersigned certifies that he has acted independently and impartially and to the best of his knowledge has no known conflict in serving as Panelist in this proceeding.

Douglas M. Isenberg as Panelist.

**PROCEDURAL HISTORY**

Complainant submitted a Complaint to FORUM electronically on July 21, 2023; FORUM received payment on July 21, 2023.

On July 21, 2023, NameCheap, Inc. confirmed by e-mail to FORUM that the Disputed Domain Name is registered with NameCheap, Inc., and that Respondent is the current registrant of the name. NameCheap, Inc., has verified that Respondent is bound by the NameCheap, Inc., registration agreement and has thereby agreed to resolve domain disputes brought by third parties in accordance with ICANN's Uniform Domain Name Dispute Resolution Policy (the "Policy").

On July 24, 2023, FORUM served the Complaint and all Annexes, including a Written Notice of the Complaint, setting a deadline of August 14, 2023, by which Respondent could file a Response to the Complaint, via e-mail to all entities and persons listed on Respondent's registration as technical, administrative, and billing contacts, and to postmaster@yelp.ai. Also on July 24, 2023, the Written Notice of the Complaint, notifying Respondent of the e-mail addresses served and the deadline for a Response, was transmitted to Respondent via post and fax, to all entities and persons listed on Respondent's registration as technical, administrative and billing contacts.

A timely Response was received and determined to be complete on August 14, 2023.

On August 15, 2023, pursuant to Complainant's request to have the dispute decided by a single-member Panel, FORUM appointed Douglas M. Isenberg as Panelist.

Having reviewed the communications records, the Administrative Panel (the "Panel") finds that FORUM has discharged its responsibility under Paragraph 2(a) of the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules") "to employ reasonably available means calculated to achieve actual notice to Respondent" through submission of Electronic and Written Notices, as defined in Rule 1 and Rule 2. Therefore, the Panel may issue its decision based on the documents submitted and in accordance with the ICANN Policy, ICANN Rules, FORUM's Supplemental Rules and any rules and principles of law that the Panel deems applicable.

**RELIEF SOUGHT**

Complainant requests that the Disputed Domain Name be transferred from Respondent to Complainant.

**PARTIES' CONTENTIONS**

A. Complainant

Complainant states that it was founded in 2004 and "owns and operates Yelp.com, a popular local search website, mobile website, and related mobile applications (collectively, the 'Yelp Service') for users to share information about their communities"; that it "provides and publishes a forum for members of the public to read and write reviews"; and that, "[a]s of December 31, 2022, users had posted over 265 million reviews to the Yelp Service, since its inception."

Complainant states, and provides evidence in support thereof, that it "owns several relevant trademarks registered with the United States Patent and Trademark Office," including U.S. Reg. Nos. 4,438,407 (registered November 26, 2013), 4,308,975 (registered March 26, 2013), 4,308,974 (registered March 26, 2013) and 3,181,664 (registered December 5, 2006) (the "YELP Trademark").

Complainant states that it sent a letter to Respondent about the Disputed Domain Name on June 27, 2023, a copy of which was provided with the Complaint.  Correspondence provided by Complainant shows that Respondent replied, in part: "would you be willing to pay the $5000 that I paid for the domain? I can provide receipts."  After Complainant asked Respondent to "provide receipts and evidence of payment for evaluation," Respondent's counsel wrote to Complainant, in part, that Respondent "is

only requesting that he recover the costs of registration, and now, legal fees, in a total sum of $10,000.00."

Complainant argues that the Disputed Domain Name is confusingly similar to the YELP Trademark because it "incorporates the YELP [Trademark] in [its] entirety and merely... adds the '.ai' top-level domain."

Complainant argues that Respondent has no rights or legitimate interests in the Disputed Domain Name because, *inter alia*, "Complainant is the exclusive holder of all rights in the YELP [Trademark] and it has not authorized Respondent to use them"; "Respondent has no affiliation, connection, endorsement or association with Complainant that would allow him to use the YELP [Trademark]"; the Whois information does not identify Respondent as "Yelp"; the Disputed Domain Name "resolves to a 404 page (i.e., the disputed domain is not being used at all), and Respondent's failure to use the disputed domain is not a *bona fide* offering of goods or services under the Policy"; and "holding an infringing domain name simply to sell it to the owner of the mark [is not] a *bona fide* offering or a legitimate noncommercial or fair use."

Complainant argues that Respondent registered and is using the Disputed Domain Name in bad faith because, *inter alia,* "when a respondent attempts to sell a contested domain to the complainant at a

price exceeding the actual registration cost, panels have found bad faith under Policy ¶ 4(b)(i)"; the Disputed Domain Name is not being used; and "Respondent registered the disputed domain name with actual knowledge of Complainant's famous marks," given that "Respondent is a Yelp user and has had a Yelp for Business account in connection with his roofing business since February 6, 2019 and a personal Yelp account since October 25, 2008."

B. Respondent

Respondent argues that the Disputed Domain Name is not identical or confusingly similar to the YELP Trademark because, *inter alia,* it "does not dispute the validity of Complainant's trademark registrations, but notes that they are limited to their respective goods and services, which can be summarized as the operation of a website for the review of other businesses and related services" and that "[t]here are many uses of the word 'Yelp' that would be non-infringing."

Respondent argues that it has rights or legitimate interests in the Disputed Domain Name because, *inter alia*, "(1) Respondent does not require Complainant's authorization to have rights or interests in the domain or trademark, (2) Respondent's use has not yet begun, so of course it would not yet be commonly known by the name, and (3) Respondent has not yet begun use, because Complainant instituted a

dispute before the website could be built." Further, "Complainant is not the exclusive holder of all rights in 'yelp,' only the exclusive holder of all rights in the registered trademarks, which are limited to the goods and services in which they are used." Respondent also states that although Complainant requested receipts and evidence of payment from Respondent, the request was made only to Respondent and "no such request was made to Respondent's counsel upon notification that Respondent has obtained such counsel." Also, "websites that require building are not often immediately available because it takes time and money to build the website, and money may come and go for ordinary individuals leading to long periods of no work being done, or having to do the work on their own." Finally: "Complainant might have known Respondent's intended legitimate use of the domain name, if it had requested such information, but it did not. Complainant assumes that because the website is not yet live that Respondent is not making use of it, but Complainant has no grounds for that assumption other than the public unavailability of the website and Complainant's own desire to obtain the domain name at minimal cost to itself."

Respondent argues that it did not register and use the Disputed Domain Name in bad faith because, *inter alia*, "Complainant is making assumptions based on its desire to obtain the domain name at a minimal cost to itself"; "Complainant never received the actual receipts for the

registration of the disputed domain name and is going by the generic quoted '.ai' top level domain price on the <namecheap.com> informational page, completely ignoring the existence of NameCheap's 'premium domains,' which are priced differently from ordinary domains"; "the inclusion of attorneys fees are not in excess, they were an estimate based on the retainer amount this attorney has developed based on experience in similar issues" and "Complainant did not request any additional information about the inclusion of attorney's fees"; "actual knowledge of a trademark does not preclude the ability to use the same word in a non-infringing manner, and the existence of a trademark registration in certain goods or services does not grant the registrant rights to preclude all other use of that same mark on different goods or services"; and "if Respondent had intended to extort Complainant or only registered the domain name to receive payment, Respondent would have attempted to sell the domain name for more than what was paid for it and associated costs, and additionally, would have contacted Complainant directly to effectuate such a sale sometime in the two-year period preceding Complainant's letter."

## FINDINGS

For the reasons set out below, the Panel finds for Complainant and orders transfer of the Disputed Domain Name.

DISCUSSION

Paragraph 15(a) of the Rules instructs this Panel to "decide a complaint on the basis of the statements and documents submitted and in accordance with the Policy, these Rules and any rules and principles of law that it deems applicable."

Paragraph 4(a) of the Policy requires that Complainant must prove each of the following three elements to obtain an order that a domain name should be cancelled or transferred:

(1) the domain name registered by Respondent is identical or confusingly similar to a trademark or service mark in which Complainant has rights; and
(2) Respondent has no rights or legitimate interests in respect of the domain name; and
(3) the domain name has been registered and is being used in bad faith.

### Identical and/or Confusingly Similar

Based upon the trademark registrations cited by Complainant, it is apparent that Complainant has rights in and to the YELP Trademark.

As to whether the Disputed Domain Name is identical or confusingly similar to the YELP Trademark, the relevant comparison to be made is

with the second-level portion of the Disputed Domain Name only (i.e., "yelp") because "[t]he applicable Top-Level Domain ('TLD') in a domain name (e.g., '.com', '.club', '.nyc') is viewed as a standard registration requirement and as such is disregarded under the first element confusing similarity test". WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Third Edition ("WIPO Overview 3.0"), section 1.11.1.

As set forth in section 1.7 of WIPO Overview 3.0: "in cases where a domain name incorporates the entirety of a trademark,… the domain name will normally be considered confusingly similar to that mark for purposes of UDRP standing." Here, the Disputed Domain Name incorporates the entirety of the YELP Trademark.

Although the YELP Trademark is, of course, registered for use only in connection with certain goods or services, this is irrelevant for evaluating the first element of the Policy. As a previous panel wrote:

> UDRP panels deciding proceedings under the Policy need not engage in an evidentiary analysis of the likelihood of confusion between a contested domain name and a registered mark, as is common in many legal actions under national trademark laws. The nature of Policy proceedings — providing a swift administrative remedy with no hearings, no evidentiary discovery, and a limited

factual and legal record — militates against such analysis. Rather, Panels have routinely held that the question under paragraph 4(a)(i) of the Policy is simply whether the alphanumeric string comprising the challenged domain name is identical to the Complainant's mark or sufficiently approximates it, visually or phonetically, so that the domain name on its face is "confusingly similar" to the mark.

*Advance Magazine Publishers Inc. d/b/a Conde Nast Publications v. MSA, Inc. and Moniker Privacy Services*, WIPO Case No. D2007-1743.

Accordingly, the Panel finds that Complainant has proven the first element of the Policy.

Rights or Legitimate Interests

Complainant has argued that Respondent has no rights or legitimate interests in the Disputed Domain Name because, *inter alia*, "Complainant is the exclusive holder of all rights in the YELP [Trademark] and it has not authorized Respondent to use them"; "Respondent has no affiliation, connection, endorsement or association with Complainant that would allow him to use the YELP [Trademark]"; the Whois information does not identify Respondent as "Yelp"; the Disputed Domain Name "resolves to a 404 page (i.e., the disputed domain is not being used at all), and Respondent's failure to use the disputed domain is not a *bona fide*

offering of goods or services under the Policy"; and "holding an infringing domain name simply to sell it to the owner of the mark [is not] a *bona fide* offering or a legitimate noncommercial or fair use."

WIPO Overview 3.0, section 2.1, states: "[w]hile the overall burden of proof in UDRP proceedings is on the complainant, panels have recognized that proving a respondent lacks rights or legitimate interests in a domain name may result in the often impossible task of 'proving a negative', requiring information that is often primarily within the knowledge or control of the respondent.  As such, where a complainant makes out a prima facie case that the respondent lacks rights or legitimate interests, the burden of production on this element shifts to the respondent to come forward with relevant evidence demonstrating rights or legitimate interests in the domain name."

Here, although Respondent has submitted arguments regarding its rights or legitimate interests, it has submitted no relevant evidence.

Specifically, paragraph 4(c)(i) enables a respondent to establish rights or legitimate interests by proving that, "before any notice to [respondent] of the dispute," the respondent used or made "demonstrable preparations to use, the domain name or a name corresponding to the domain name in connection with a bona fide offering of goods or services."  Here,

however, the record contains no evidence of such use or preparations; instead, respondent only argues that "Complainant assumes" such lack of use or preparations "because the website is not yet live." But Respondent has made no arguments, has presented no evidence that it has used or made preparations to use the Disputed Domain Name, and has admitted that "Respondent's use has not yet begun."

Further, paragraph 4(c)(ii) enables a respondent to establish rights or legitimate interests by proving that it has "been commonly known by the domain name." Respondent has made no arguments that it has been commonly known by the Disputed Domain Name, the record indicates that Respondent is known as "Paul Moreno / Moreno Roofing and Solar" and Respondent has admitted that "it would not yet be commonly known by the name."

Finally, paragraph 4(c)(iii) enables a respondent to establish rights or legitimate interests by proving that it is "making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue." Although Respondent refers vaguely to its "intended legitimate use of the domain name," Respondent does not assert that it has actually made any use of the Disputed Domain Name (in connection with a website or otherwise), and it has not denied

Complainant's assertion that the Disputed Domain Name has not been used. Indeed, as stated above, Respondent admits that its "use has not yet begun."

Accordingly, the Panel finds that Complainant has established its prima facie case and without any evidence, or even relevant assertions, from Respondent to the contrary, the Panel is satisfied that Complainant has satisfied the second element of the Policy.

Registration and Use in Bad Faith

Whether a domain name is registered and used in bad faith for purposes of the Policy may be determined by evaluating four (non-exhaustive) factors set forth in the Policy: (i) circumstances indicating that the registrant has registered or acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of the registrant's documented out-of-pocket costs directly related to the domain name; or (ii) the registrant has registered the domain name in order to prevent the owner of the trademark or service mark from reflecting the mark in a corresponding domain name, provided that the registrant has engaged in a pattern of such conduct; or (iii) the registrant has registered the domain name

primarily for the purpose of disrupting the business of a competitor; or (iv) by using the domain name, the registrant has intentionally attempted to attract, for commercial gain, Internet users to the registrant's website or other online location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of the registrant's website or location or of a product or service on the registrant's website or location.  Policy, paragraph 4(b).

As described above, the Disputed Domain Name is not associated with an active web page, and Respondent has stated that its "use has not yet begun." As set forth in section 3.3 of WIPO Overview 3.0:

> From the inception of the UDRP, panelists have found that the non-use of a domain name (including a blank or "coming soon" page) would not prevent a finding of bad faith under the doctrine of passive holding.

> While panelists will look at the totality of the circumstances in each case, factors that have been considered relevant in applying the passive holding doctrine include: (i) the degree of distinctiveness or reputation of the complainant's mark, (ii) the failure of the respondent to submit a response or to provide any evidence of actual or contemplated good-faith use, (iii) the respondent's

concealing its identity or use of false contact details (noted to be in breach of its registration agreement), and (iv) the implausibility of any good faith use to which the domain name may be put.

Citing *Telstra Corporation Limited v. Nuclear Marshmallows*, WIPO Case No. D2000-0003.

The Panel acknowledges and agrees with Respondent's arguments that the word "yelp" "has a common meaning and definition." However, the same can be said of many trademarks, such as APPLE and VISA, just to name two well-known examples. The YELP Trademark is very distinctive and has a strong reputation, given that, as set forth above, it is protected by multiple registrations, the oldest of which was issued at least more than 16 years ago; and Complainant's users have posted more than 265 million reviews to the Yelp Service. Plus, according to documentation provided by Complainant, Complainant had net revenue of $312 million in the first quarter of 2023. Although Respondent has submitted a response, it has not provided provide any evidence of actual or contemplated good-faith use of the Disputed Domain Name; and it has only vaguely stated that "Respondent's use is unknown to Complainant and is certainly not infringing nor intended to infringe."

Further, section 3.14. of WIPO Overview 3.0 says: "Panels have consistently found that the mere registration of a domain name that is identical or confusingly similar (particularly domain names comprising typos or incorporating the mark plus a descriptive term) to a famous or widely-known trademark by an unaffiliated entity can by itself create a presumption of bad faith."  Here, for the reasons cited above, the Panel finds that the YELP Trademark is famous or widely known for purposes of the Policy, which creates a presumption of bad faith.

In addition, paragraph 4(b)(i) of the Policy enables a complainant to establish bad faith if a panel finds "circumstances indicating that [respondent] ha[s] registered or [respondent] ha[s] acquired the domain name primarily for the purpose of selling, renting, or otherwise transferring the domain name registration to the complainant who is the owner of the trademark or service mark or to a competitor of that complainant, for valuable consideration in excess of [respondent's] documented out-of-pocket costs directly related to the domain name." Here, it is uncontroverted that Respondent initially asked Complainant if it would "be willing to pay the $5000" that Respondent alleges it paid for the Disputed Domain Name, that Respondent offered to provide "receipts" for same, that Complainant requested but never received such receipts, and that Respondent's counsel later said that Respondent "request[ed] that he recover the costs of registration, and now, legal fees,

in a total sum of $10,000.00." Although Respondent argues, and even provides evidence to support, that "NameCheap's 'premium domains'… are priced differently from ordinary domains," Respondent does not state that the Disputed Domain Name is such a "premium domain," nor does Respondent dispute a screenshot provided by Complainant that NameCheap offers .ai registrations for $79.98. Respondent is in the best (if not the only) position to provide evidence of its actual costs related to the Disputed Domain Name, yet it has not done so and, in fact, it has not disputed that such costs were more than the $79.98 advertised price. Accordingly, it appears as if Respondent's attempt to sell the Disputed Domain Name to Complainant for at least $5,000 is for valuable consideration in excess of its documented out-of-pocket costs directly related to the Disputed Domain Name. See, e.g., *Yahoo Inc. v. Zanybh Solutions*, FA 2022496 (Forum Dec. 12, 2022) (finding bad faith where respondent offered to transfer domain name to complainant for $5,000); and *VNG CORPORATION v. Manh Hung Nguyen*, FA 1967590 (Forum Nov. 4, 2021) (finding bad faith where respondent offered to transfer domain name to complainant for $5,000).

Accordingly, the Panel finds that Complainant has proven the third element of the Policy.

DECISION

Having established all three elements required under the ICANN Policy, the Panel concludes that relief shall be **GRANTED**.

Accordingly, it is Ordered that the &lt;yelp.ai&gt; domain name be **TRANSFERRED** from Respondent to Complainant.

DOUGLAS M. ISENBERG, Esq.
Panelist

Douglas M. Isenberg, Panelist

Dated: August 26, 2023